IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

TAYLOR NIESEN,

       Plaintiff(s),

vs.

IOWA STATE UNIVERSITY, PAUL
TANAKA, in his individual and official
capacity as General Counsel for Iowa State
University, BOARD OF REGENTS, STATE
OF IOWA; and STATE OF IOWA,

       Defendant(s).

4:17-cv-201-RAW

RULING ON DEFENDANTS' MOTION TO
DISMISS

Defendants' resisted Fed. R. Civ. P. 12(b)(6) motion to dismiss [2] is before the Court.  No
party requests oral argument and the Court finds the motion can be decided on the motion papers.
LR 7(c).

The case was removed to this Court. Plaintiff Taylor Niesen was an undergraduate student
at the Iowa State University ("the University"). She alleges that in January 2015 she was sexually
assaulted at a fraternity by a male University student. The Petition ("Complaint") is in two counts.
Count I is a claim under Title IX of the Education Amendments of 1972. 20 U.S.C. § 1681. It
alleges that in the circumstances the University is liable for the assault as well as the inadequacy
of both its response to the assault and subsequent student peer retaliation against Ms. Niesen for
reporting the assault. The parties' briefing of the motion bifurcates the Title IX action into two
distinct claims – one for "pre-alleged assault" liability and the other for "post-alleged assault"
liability. Pre-alleged liability is for the assault itself. Post-alleged liability is for the response.

Count II alleges negligence under the Iowa Tort Claims Act, Iowa Code ch. 669.

In response to the motion, Ms. Niesen states she agrees to dismiss the individual defendant (University General Counsel Paul Tanaka), the State of Iowa and the Board of Regents from the Title IX claim, and the claim for punitive damages, leaving only the University as a defendant to claims for actual damages and equitable relief. She also agrees to dismiss the negligence claim, Count II, in its entirety without prejudice. Defendants take these statements as voluntary dismissals and so will the Court. Fed. R. Civ. P. 41(a).

## I.

On a Rule 12(b)(6) motion to dismiss the court takes the well-pleaded facts as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 914 (8th Cir. 2001). To survive a motion to dismiss the Complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief which is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Twombly*, 550 U.S. at 570). To be plausible, factual content must be pleaded which "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Mere "'labels and conclusions'" and "'naked assertion[s]' devoid of 'further actual enhancement'" will not do. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). Plausibility does not require a showing of probability, for a well-pleaded complaint may proceed even if ultimate proof of the facts strikes the judge as improbable or "that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). With these pleading standards in mind the Court turns to the claims presented.

## II.

A.    Title IX

 Title IX prohibits sex discrimination "under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). The University receives Federal financial assistance within the meaning of the statute. (Complaint [1] ¶ 3). A private cause of action for discrimination based on sex may be brought under Title IX. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 708-09 (1979). "Sexual harassment and sexual abuse clearly constitute discrimination under Title IX. . . ." *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (citing *Franklin v. Gwinnett County Public Sch.*, 503 U.S. 60, 75 (1992)). Sexual assault is sexual harassment at its worst.

 The statute does not impose vicarious liability on a federal fund recipient. The recipient "may only be liable for damages arising from its own misconduct." *Ostrander*, 341 F.3d at 750 (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999)). "Where . . . the plaintiff's Title IX claim is based on harassment, the school is liable in damages only where it is '(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'" *K.T. v. Culver-Stockton College*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ostrander*, 341 F.3d at 750). In addition, "the discrimination must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school.'" *Id.* (quoting *Davis*, 526 U.S. at 650).

B.    Pre-Alleged Assault Liability

 The determinative issue with respect to the University's alleged liability for the sexual assault itself is the sufficiency of the pleading on the knowledge element. Here, that element may be satisfied by pleading and ultimately proof the University had actual knowledge (1) from the student assailant's previous known conduct that he presented a substantial risk to sexually assault

other students, *K.T.*, 856 F.3d at 1058 (citing *Thomas v. Bd. of Trustees of the Nebraska State Colleges*, 667 Fed. Appx. 560, 562 (8th Cir. 2016 )(per curiam)); (2) from previous reports of sexual harassment occurring at the fraternity in question that students were at substantial risk of sexual assault by student peers at the fraternity, *id.*; or (arguably for present purposes) (3) from reports of similar incidents that "a certain segment of the student body" presented a heightened risk to sexually assault other students. *See Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 807 (M.D. Tenn. 2016).

Ms. Niesen does not allege her assailant's known history put the University on notice that he posed a substantial risk to sexually assault other students. There is no allegation he had a relevant prior history or that the University had any information about him which should have alerted it to the risk. He is not named. The Complaint alleges nothing about him other than that he sexually assaulted Ms. Niesen and was a member of an unidentified fraternity. (Complaint [1] ¶¶ 30, 31).

The prior incident information pleaded in the Complaint is that "several fraternities . . . hosted parties with alcohol and drugs," the fraternity where Ms. Niesen was assaulted had banned drugs and alcohol though both remained "rampant" at the fraternity, the fraternity had had one or two unspecified violations of University and "Greek" policy prior to the assault and during the 2014-2015 academic year, and the University had received "several complaints regarding sexual assaults and potential violations of student misconduct policies within the Greek community and the fraternity" where Ms. Niesen was assaulted. (Complaint [1] ¶¶ 84-89). Beyond this the Complaint contains nothing about the number and frequency of sexual assaults at the fraternity, over what period of time they occurred (the Complaint alleges only "[p]rior to [Ms. Niesen's] enrollment and during her time at ISU" (*id.* ¶ 89)), their similarity to the assault experienced by

Ms. Niesen, or other relevant context (for example, whether the assault occurred at a fraternity function or the role, if any, alcohol and drugs played).

At bottom, the sufficiency of the Complaint on the knowledge element is dependent on the allegation there were "several" complaints of sexual assaults and student conduct violations in the Greek community and the fraternity in question over an unspecified period of time.  Without any "factual enhancement" this brief reference is simply too vague and general, as  well as over inclusive in its reference to other unspecified policy violations, to permit a reasonable inference that the University had prior knowledge of a "substantial risk" of peer harassment at the fraternity. *K.T.*, 865 F.3d at 1058 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The Complaint thus fails to state a plausible claim that previous complaints of sexual assault at the fraternity gave the University actual knowledge that students faced a substantial risk of sexual assault there.

The Complaint makes reference to an "epidemic of sexual assaults within the Greek Community." (Complaint [1] ¶ 89). From this and the many other references to problems in the Greek community the Complaint appears to attempt to state a claim based on a heightened risk of sexual assaults by male members of that "segment of the student body." *Doe*, 186 F. Supp. 3d at 807.

There are 61 Greek organizations at the University and 14.6% of all undergraduate students, male and female, are members of the Greek community. (Complaint [1] ¶ 26).  Ms. Niesen was part of the community as a sorority member. (*Id.* ¶ 47). She does not allege, and does not plead any facts which would support an inference, that the risk of sexual assault by male members of the Greek community is significantly above the risk of student-on-student sexual assault in the broader student population, much less that the University had knowledge of the risk.

Ms. Niesen's Complaint is much different than that unsuccessfully challenged in *Doe*, *supra*, the only case on which she relies for this part of her pre-alleged assault liability claim. The plaintiffs in *Doe* alleged the University defendant there had notice "of a specific and concrete pattern of an 'inordinate' number of sexual assault allegations against members of specific teams within" the defendant University's athletic department. Plaintiffs fortified their claim with allegations "of a number of recent prior sexual assaults by . . . football and basketball players under similar circumstances as" the assaults on the plaintiffs. 186 F.3d at 807. By contrast, Ms. Niesen's Complaint is far short of offering concrete allegations of a distinct pattern of similar prior sexual assaults by male members of the Greek community (presumably fraternity members) sufficient to place the University on notice that male fraternity members as a group posed an "acute risk[ ] to female students . . . well above and beyond the general risks of student-on-student harassment." *Id.* at 807.  That such a broad and numerous class of male students, connected only by membership in one of many fraternities, would present a significantly heightened risk to sexually assault female students is facially implausible.

The University also argues Ms. Niesen does not adequately plead the control element of Title IX liability. Damages liability under the statute extends only "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. As noted above, the Complaint pleads very little information about the student perpetrator of the assault. It does not identify the fraternity where the assault occurred, whether it was located on or off campus, or the context in which the assault occurred beyond the fact it occurred at the fraternity. These shortcomings make the Complaint marginal on the control element. However, the Complaint alleges the University's Assistant Dean of Students serves as the "Director of Greek Life." (Complaint [1] ¶ 59). The University has an

"Office of Greek Affairs" staffed by University employees which provides resources, support and services to Greek organizations. (*Id.* ¶ 61). The Office of Greek Affairs tracks violations of University policies and reports of sexual assault within the Greek community. (*Id.* ¶¶ 81-88). After Ms. Niesen reported the assault the police began an investigation during which the fraternity was temporarily shut down and stopped having parties (at whose instance the Complaint does not say). (*Id.* ¶¶ 40, 41). That the University assigned a senior faculty member to monitor Greek affairs and compliance with University policies, and the fraternity's activities were curtailed after Ms. Niesen reported the assault, permits an inference that the University exercised general supervisory and disciplinary authority over the goings-on in fraternities sufficient to avoid dismissal on the control element.

For the reasons given, the Complaint fails to state a claim for pre-alleged assault liability under Title IX upon which relief could be granted.

C.      Post-Alleged Assault Liability

Ms. Niesen alleges the University was deliberately indifferent to her sexual assault complaint and subsequent complaints about retaliation from student fraternity and sorority members for having reported the assault. The latter, she says, led to a "hostile educational environment" which compelled her to leave the University. (*See, e.g.*, Complaint [1] ¶ 97).

The facts recited in the Complaint are affirmatively against any claim that the University was deliberately indifferent to her sexual assault complaint. The University investigated the matter. Ms. Niesen provided a statement to the University's EO Office and Title IX Coordinator. (Complaint [1] at ¶ 32). Her assailant hired an attorney and refused to be interviewed by University representatives. (*Id.* ¶ 33). The University was "unable to find the accused responsible for the assault . . . because of insufficient evidence." (*Id.* ¶ 34). Ms. Niesen's report of the assault to the

Ames, Iowa Police Department evidently faced the same stumbling block. Ms. Niesen does not allege the University's investigation was inadequate. When she requested an on-campus no contact order from the University it was granted. (*Id.* ¶ 35). Though Ms. Niesen would frequently see her assailant on campus and the University's bus system, she does not claim he violated the no-contact order or that the University failed to enforce it. Nor does she allege her assailant engaged in any further sexual harassment of her.

Ms. Niesen states in her Complaint that as a result of the police investigation her assailant was suspended from his fraternity, the fraternity house stopped having parties, and the fraternity was temporarily shut down. (Complaint [1] ¶ ¶ 40, 41). She does not attribute this action to the police, the University, or the fraternity itself, but her report had concrete consequences for both the student and the fraternity.

After the assault Ms. Niesen took a rape kit to the hospital. The rape kit results were not reported until the Winter of 2016. The results were positive. Ms. Niesen's assailant has not been suspended or expelled, but the University has reopened its sexual misconduct investigation of him. (Complaint [1] ¶ ¶ 81-83).

A Title IX funding recipient is deliberately indifferent to student-on-student sexual harassment only where "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The Complaint pleads no facts which would support an inference that the University's response to her reported sexual assault was clearly unreasonable in the circumstances, and indeed, the pleaded facts only support a contrary inference.

Much of Ms. Niesen's Complaint details facts in support of her claim she was the victim of student-on-student retaliation for having reported the sexual assault, and the University did not

respond to her complaints about the retaliation and requests for assistance to deal with it. She alleges that on a regular basis throughout the Fall 2015 semester she was "publicly humiliated and shamed by other students for claiming she had been sexually assaulted." (Complaint [1] ¶ 58). Soon after she reported the assault the "social risk manager" at the fraternity where the assault occurred sent an email to chapter members telling them they should not interact with her. (*Id.* ¶ 46). Her sorority sisters isolated her, ostracized her, blamed her, and told her on multiple occasions that she was lying and her accused attacker would "never have done that." (*Id.* ¶ ¶ 47, 49, 52). Members of the Greek community blamed Ms. Niesen for causing the fraternity to shut down. (*Id.* ¶ 53). She was not welcome at Greek social events. She was subjected to jeering, chanting and students would make comments like: "Nobody get near Taylor she'll call the cops and claim rape." (*Id.* ¶ 55). Her sorority sisters stopped socializing with her. (*Id.* ¶ 73).

Ms. Niesen alleges she reported the retaliatory behavior to the Assistant Dean of Students who told her the Greek community would address the retaliation, but nothing was done. (Complaint [1] ¶ ¶ 59, 62, 63). Emotional distress from the retaliation and social isolation affected Ms. Niesen's academic performance. (*Id.* ¶ 64). She sought help Spring and Fall 2015 semesters from various offices on campus, but the University did not know how to respond to her as a victim of sexual assault. (*Id.* ¶ 6). She asked the Dean of Students office to inform her professors about the situation and the need for academic accommodations, but this was not done. (*Id.* ¶ 77). Ms. Niesen's grades suffered, she stopped attending class, and ultimately dropped out because, she alleges, "[h]er sorority would not support her, the Greek community banded together to isolate her and her academic performance suffered as a result of the hostile educational environment." (*Id.* ¶ 80).

Taking all of this as true as the Court must on a motion to dismiss, the Complaint includes enough factual content to state a plausible claim that Ms. Niesen's fraternity and sorority student peers retaliated against her for reporting the sexual assault, appropriate University officials were aware of the retaliation, but made little or no effort to respond to it. The University argues that, even so,[1] these facts do not make out a Title IX claim. It notes the Supreme Court has never recognized a private right of action for deliberate indifference to student-on-student retaliation. That is true, in fact the parties do not refer the Court to any case on point. The Supreme Court has, however, held "that when a funding recipient retaliates against a person <u>because</u> he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (emphasis original). The Jackson court explained that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of discrimination." *Id.* Sexual harassment and sexual abuse are also sex discrimination. If a student-on-student sexual assault can in the limited circumstances described by the Supreme Court in *Davis* give rise to a Title IX private cause of action against an institutional recipient, there is no reason why student-on-student retaliation for reporting the assault should not be actionable under the same circumstances.

The Complaint adequately pleads the University's knowledge of the retaliation, inaction which could amount to deliberate indifference, and that the retaliation was severe, pervasive and offensive enough to have denied Ms. Niesen equal access to institutional resources and opportunities. That it contains sufficient factual matter to plausibly plead the University's control over both the unnamed students who retaliated and of the context is a closer question as it was with respect to the pre-alleged assault liability claim discussed previously. *Supra* at 6-7.

---

[1] The University does not, of course, admit the truth of the retaliation averments.

10

The University rightly points out that it cannot control individual students' opinions about the truth of Ms. Niesen's claim to have been sexually assaulted, the expression of those opinions or dislike of Ms. Niesen, or the decision to associate or not with her. The students have a First Amendment right to believe what they want, express themselves, and associate with whom they want. Individual First Amendment rights do not necessarily extend to the exclusion of Ms. Niesen from the programs and activities of her sorority in which she would otherwise be entitled to participate, concerted action to isolate her from her peers, or verbal abuse of the kind she alleges. It is not necessary, and would be unwise, to at this early point attempt to chart the path between protected speech and association on one hand and unprotected retaliatory conduct on the other. That must await further development of the factual record. It is enough that the Complaint does not on its face allege retaliatory conduct which in all aspects would clearly be protected speech or association.

As noted before, the facts pleaded in the Complaint give rise to a reasonable inference that the University exercises general supervisory and disciplinary authority over fraternities, sororities, and their student members. In addition to this, Ms. Niesen alleges that when she reported the student retaliation to the Assistant Dean of Students, the Dean told her the Greek community would "address the retaliation," (Complaint [1] at ¶ 62) an implicit indication the University was in a position to exercise some control over the retaliatory behavior. In the post-*Twombly/Iqbal* age it remains the case that a complaint is to be construed "liberally in the light most favorable" to plaintiff. *In re: Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1070 (8th Cir. 2017) (quoting *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008)). Doing so here, the Court concludes Ms. Niesen's Complaint is factually sufficient to plead the control element of her post-alleged assault retaliation claim.

## III.

Defendants' Motion to Dismiss [2] is **granted in part and denied in part** as follows. Plaintiff's Title IX claim, Count I, is dismissed for failure to state a claim upon which relief can be granted with the sole exception of post-alleged assault liability for actual damages and equitable relief against the University based on student-on-student retaliation.

Count II is voluntarily dismissed without prejudice.

As a consequence of this ruling all defendants are dismissed except the defendant University, against which the action proceeds only on the limited claim noted.

IT IS SO ORDERED.

Dated this 3d day of November, 2017.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE